## Hollandsworth et al. v. Sparks et al.

February 3, 1948.

Ray C. Lewis, Judge.

Llewellyn & Cunnagin for appellants.

Lewis & Weaver for appellees.

OPINION OF THE COURT BY JUDGE KNIGHT—Affirming.

Appellants, plaintiffs below, heirs at law of Joshua Hollandsworth, deceased, brought this suit against appellee, defendant below, Lloyd Sparks, to cancel a deed which had been executed by said Hollandsworth to said Sparks on March 2, 1945. From a judgment of the lower court dismissing the petition and denying the relief sought, this appeal is prosecuted.

Statement of the Case.

Joshua Hollandsworth, a widower, died intestate,

a resident of Jackson County, Kentucky, on August 20, 1945. He had been the owner in fee simple of a tract of land containing 40 acres, more or less, located on the headwaters of Pigeon Roost of Indian Creek and which is described in the petition. Plaintiffs in this action are his surviving children and grandchildren, being his only heirs at law except that one daughter, Laura Harrison, wife of John B. Harrison, refused to join in as plaintiff and was made a defendant. The petition alleges that within two or three months prior to the death of said Joshua Hollandsworth and at the time he was 75 years old and in bad health and very feeble and at a time when he was incompetent to execute a deed to his property and at a time when he did not have mind enough to know the nature or value of his estate or property, the defendant, Lloyd Sparks, fraudulently procured the said Joshua Hollandsworth to make him a deed to the tract of land above referred to for a consideration of $1,000.00, while in fact the said tract of land is worth more than $2,000.00; that said Lloyd Sparks through and by undue influence of himself and other parties procured the said Joshua Hollandsworth to make him a deed to the land; that said Lloyd Sparks at the time knew of the feeble and incompetent condition of the said Joshua Hollandsworth and thereby took fraudulent advantage to procure a deed to said tract of land for less than half of the real value thereof. The plaintiffs pray judgment cancelling said deed and for costs, etc. Defendant, Lloyd Sparks, filed an answer denying the allegation of the petition thus making up the issues.

Since the question in this case is largely a factual one, it will be necessary to make some analysis of the evidence in order to determine the issue involved.

### Plaintiffs' Proof.

In support of their claim for cancellation, plaintiffs took the testimony of thirteen witnesses. Three of these, Frank Hollandsworth, Harry Hollandsworth and Stella Potter, plaintiffs in the case and children of decedent, testified in substance that their father was about 77 years of age when he died; that he was in bad health for several months before he died and was in bed when the deed was made on March 2, 1945; that he was in bad condition mentally as well as physically and

at times did not know his own children and grandchildren or some of his neighbors; that on one occasion he did not know his preacher who had called on him frequently. All of these witnesses testified to some incident, some hallucination deceased had which indicated that his mind was not right; that he was a man of limited education being able to read little and could barely write his name. All testified that the land in question lay on an improved highway and estimated the land to be worth about $3,000.00.

Scott Cox testified that he had known deceased for 25 years and belonged to the same religious denomination and saw him several times a month; that about two years before his death he noticed a change in him in that he sometimes would not know the witness and once deceased did not know his daughter with whom he lived. Susan Cox testified that she had known deceased for many years; that she visited him several times during his last illness; that he was in bed and that on several occasions he didn't recognize her. She admitted on cross examination that before his last illness, some four or five months before he died, he did not fail to recognize her.

Henry Nunn testified that he had known deceased about 25 years and saw him four or five times while he was sick; that he knew him every time he went to see him except possibly the last time; admitted on cross examination that he didn't see any difference in mind of deceased but that he was just sick and weak.

Russell Hays, assistant cashier of the Jackson County Bank, testified that John B. Harrison, son-in-law of deceased, presented a check for $1,000.00 payable to deceased and drawn on account of Neal Vickers which check was cashed on March 3, 1945; that on May 9, 1945, Laura Harrison, daughter of deceased, deposited $770.00 in his bank to her own account; that on March 3, 1945, Lloyd Sparks gave a check to Neal Vickers for $1,200.00 drawn on his bank.

Dr. Arthur G. Baker, 26 years old, graduate of the University of Michigan, who had been in general practice about 15 months, testified that he was called to make an examination of Joshua Hollandsworth in March 1945 to ascertain his mental condition; that he found

him at his daughter's home sitting in a chair coughing lightly and spitting on the floor. He did not notice his entrance nor did he appear to understand his questions, even though his daughter repeated them for him; asked his name, he did not answer; nor did he know his age, the day of the week or year. Since further questioning appeared useless, he did not carry it further. He gave it as his opinion that he was suffering from senile dementia; that in that condition, he might or could be easily overreached or overpersuaded in making a deal that would be injurious to his property rights. On cross examination, he admitted that he was not especially trained in mental diseases, but made his tests and observations from his general knowledge of medicine and his general practice and internship.

Lloyd Sparks, the defendant, called as a witness for plaintiff, testified on cross examination that he was present when Mr. Hollandsworth made the deed to Neal Vickers and that Vickers paid Hollandsworth $1,000.00 for the property; that after they returned to town, Vickers said the property didn't suit him and Sparks offered to give him $1,200.00 for the property on condition that Vickers would move to Sparks' place at Grayhawk and take care of his stock and place there; that they then returned to the Hollandsworth home where the deed to Vickers was torn up and a new deed executed from Hollandsworth to Sparks; that this latter deed had never been recorded because he just hadn't got around to it; that at the time these deeds were executed, Joshua Hollandsworth was not in bed but was sitting up; that he knew Hollandsworth had been sick and walked like a weak man, but that he wasn't down, and that he did not know Hollandsworth's age at that time.

On rebuttal, plaintiff introduced as further witnesses, Junior Smith, J. E. Gibson, Isaac Addison and Alva Coyle. They all testified that they had known Hollandsworth and that for a year or two previous to his death, there were occasions when he would not know them or recognize them as they would meet him. Each told of some instance which indicated a bad mental condition, loss of memory or that his mind wasn't just right.

Defendant's Proof.

Lloyd Sparks, defendant, testified that by actual

survey, the tract he bought from Mr. Hollandsworth contained 31 2/100 acres; that the only improvement on it was an old box house in bad condition worth about $50.00; that there was no timber on the land, only some bushes that had come up after the land was cleared; that the land was very poor and worn out and if it was not on a good highway, it would be worth nothing; that it was fenced with a poor rail fence on one side and a string of barbed wire on the other; that the reasonable market value of the land he bought was $1,000.00; that there were present when the deed was made, Hector Johnson, Neal Vickers, Laura Harrison, daughter of Hollandsworth, Laura Harrison's son and himself; that Hollandsworth had traded with him as a merchant for 20 odd years; that at the time this deal was made, his mental condition was good; he observed nothing wrong with him or any change in his mental condition from what it had been during the years he had known him and that in his opinion, he had sufficient mental capacity to sell and dispose of his property. He admitted on cross examination that Hollandsworth had been sick about a year previous to that transaction and could not go about much, but was not confined to his bed.

Laura Harrison, daughter of John Hollandsworth, testified that her father was living with her at the time of his death and had been living with her for a number of years; that he had been "kind of puny" for about a year; that she noticed nothing wrong with his mental condition until he took his death bed about a month before his death; that he knew everybody with whom he was acquainted; that she was present when the deed was made to Vickers and later to Sparks; that her father was sitting in the front room by the fire at the time and she could see nothing wrong with his mind; that she didn't care one way or the other whether he sold the property; that with the exception of about $130.00, which she paid for her father's burial expenses, she used the rest of the money for herself, bought a horse, cow and feed, and used the rest for paying debts; that her father had given her this money saying he did not want the others to have any of it; that her father had tuberculosis of the bowels for about two years before he died and she had to wait on him and take care of him during all that time.

John Ramsey testified that Hollandsworth had offered to sell him the tract which he sold to Sparks for $600.00 about six years ago but he didn't buy it; that in 1944, he had bought 49 acres in the same general vicinity, all woodland with no improvements on it, for $1,550.00; that he is now holding said property at $4,-000.00, but it now has on it a six-room dwelling which he had built; that in his opinion, the land which Sparks bought from Hollandsworth was worth about $1,000.00 at the time of the sale.

L. V. Morris, former jailer and former deputy sheriff, who had lived in this vicinity for 17 years and had bought and sold property in the vicinity, testified that when he learned that Sparks had paid $1,200.00 for the land in question, he thought he had paid high for it; that he had known Hollandsworth a long time and had had conversations with him during the years he had known him and never did see anything wrong with his mind but knew he was a man of limited education. He admitted on cross examination that Hollandsworth was in bad physical condition when he had seen him during his last illness, and perhaps including February and March 1945, but he was uncertain about the dates.

Neal Vickers, who first bought the property from Hollandsworth and later sold it to Sparks, testified that Hollandsworth had offered him this same property in 1943 for $800.00 and he refused to give it but bought it in 1945 for $1,000.00; that Hollandsworth was a weakly person but he could see nothing wrong with his mind in his dealings with him at the time of the trade; that at the time of the trade, he was sitting before the fire at his home, was sick and had been sick for some time.

J. R. Peters testified that he had known Mr. Hollandsworth for over 50 years and lived within 100 yards of him at the time of his death; that he saw him three or four times a day as Hollandsworth traded with him in his store and that he never noticed anything wrong with his mind except that he was just an old man; that in February and March 1945, he was not down in bed but was not very stout and he would sometimes fall down and had to be helped up; that Hollandsworth, before he died, had made several trades, having sold a wagon, mowing machine, cow and a small piece of land;

that he was familiar with the tract of land bought by Sparks and that he would not have given over $1,000.00 for the land and in his opinion that was its reasonable market value.

Hector Johnson, attorney and school-teacher at McKee, testified that he had known Joshua Hollandsworth for over 40 years and had seen him almost every week up until the time of his last illness and death; that he wrote the deed from Hollandsworth to Vickers and later changed the deed from Vickers to Sparks covering the land in dispute; that at the time the deed was made, he could not see anything wrong with Hollandsworth's mind or anything different from what it had been for some time and that in his opinion he had sufficient mind to know what he was doing; that when the first deed was made to Vickers, Hollandsworth was sitting up in his room, but was lying on the bed when they went back with the second deed several hours later; that he was not acquainted with the reasonable market value of the land in question.

James R. Hays, banker, for the past 45 years connected with the Jackson County Bank, who had known Joshua Hollandsworth almost all of his life, testified that he would see him about every week or two; that he had done business with his bank for many years; that he had never seen anything about his appearance or conversation to indicate there was anything wrong with his mind although he had very little education. Admitted on cross examination that he had not had any dealings with him since about April or May 1944, and couldn't say that he had seen him after that time and didn't know of his mental condition in March 1945.

Russell Hays testified that he knew Mr. Hollandsworth; saw him once or twice a year; the last time he had seen him was in the fall of 1944 at which time he bought a mowing machine and hay rake from him for $80.00 and that he did not notice anything wrong with his mind at that time. Admitted on cross examination that the transaction referred to was in March 1944, and that he did not know the condition of his mind in March 1945.

Herman Adkins had lived near Mr. Hollandsworth for 21 months prior to his death and testified that he

saw him two or three times a week, sometimes every day, but had not transacted any kind of business with him although he had talked to him frequently; that his health was poor, so poor that he could hardly get around but that in talking with him, he did not observe anything wrong with his mind; that it was just like it had been for years, but that he had heard some talk that his mind was not right; that his conversations with him were five or ten minutes in length and were in general about weather, crops, etc.

Lloyd Sparks, recalled, testified that Hollandsworth had listed this land for taxes in July 1944, for $550.00. He further testified that there was not a tree on the tract that would make a saw log.

Jess Sparks, a distant relative of Lloyd Sparks, testified that he had known Hollandsworth all his life and had lived on Hollandsworth's place for four years, having rented it from him; that he saw him most every day and he did not see any actions or appearances that would indicate there was anything wrong with his mind. This was prior to 1943. He lived in Cincinnati nearly a year and after he returned in 1943, he saw him occasionally and talked with him and could not see any change in his mental condition during that time. It was his opinion that he had enough mind to know what he was doing. Admitted on cross examination that he couldn't say whether or how often he had seen the deceased in the months of February and March 1945.

Dr. H. A. Hughes, a graduate of the University of Louisville Medical School and in general practice at McKee for the past 30 years, testified that he had known Hollandsworth for about four years prior to his death; that he had treated him professionally two or three times in the last two years and a month or two before he died in August 1945; that his last illness was chronic diarrhea and that he was a delicate, frail man; that he never observed anything wrong with his mental condition and there was nothing about his conversation or appearance that would indicate he was mentally off and that his mental condition seemed to be the same all the time. Admitted on cross examination that he had not seen Mr. Hollandsworth in March 1945 but that it was sometime in June of that year.

## Conclusion.

It will be observed from this resume of the evidence that there is considerable conflict in the testimony. The chancellor, in an opinion filed in the record, after reviewing this conflicting testimony, says: "Considering the evidence as a whole, the court is of the opinion that the plaintiffs failed to show that the deceased at the time he executed, signed and delivered the deed complained of, was lacking in mental capacity to make the deed, or that the deed was the result of undue influence exercised over the decedent."

The chancellor, who no doubt, knew the witnesses or most of them, was in a better position to pass upon the facts and to determine the weight to be given in the evidence than we are. While the chancellor's finding of fact is not binding upon this court, it will be given great weight and will not be disturbed where substantially supported by evidence or where there is such conflict of evidence that the Appellate Court is left in doubt as to whether evidence supports the judgment. Henson et al. v. Jones, 247 Ky. 465, 57 S. W. 2d 498.

This alone would justify us in not disturbing the findings of the chancellor and affirming his decision. However, for a special reason indicated in appellants' brief not necessary to mention here, we have disregarded the chancellor's opinion, have carefully read all the proof, considered the inferences to be drawn therefrom and on the whole case, we are of the opinion that plaintiffs, who had the burden of proof, have not established that there was undue influence brought to bear upon Joshua Hollandsworth to cause him to make the sale or that the price was so inadequate or that his mental condition at the time of the sale was such as to justify us in saying that the deed should be set aside. Wherefore the judgment is affirmed.